Civil Action No.: 11-cv-03074-JLK-BNB

TIMOTHY SIAKI,
KIMBERLEE MOORE,
MICHAELEE OWEN,
JEANINE ROYBAL,
COLORADO CROSS-DISABILITY COALITION, a Colorado nonprofit organization, and
COLORADO ASSOCIATION OF THE DEAF, a Colorado nonprofit organization,

       Plaintiffs,

v.

DOUGLAS DARR, in his official capacity as Sheriff of Adams County, Colorado,

       Defendant.

---

## AMENDED COMPLAINT

---

Plaintiffs, Timothy Siaki, Kimberlee Moore, Michaelee Owen, Jeanine Roybal, Colorado

Cross-Disability Coalition ("CCDC"), and Colorado Association of the Deaf ("CAD") by and

through undersigned counsel, hereby bring this Complaint against Douglas Darr, in his official

capacity as Sheriff of Adams County, Colorado, for violations of the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and  Section 504 of the Rehabilitation Act of 1973

("Section 504"), 29 U.S.C. § 794, *et seq*.

### Introduction

1.      On July 26, 1990, now more than twenty years ago, the ADA was passed,

establishing the most important civil rights law for people with disabilities in the nation's

history.

2. The ADA was passed to ensure people with disabilities are not discriminated against.

3. One of the purposes of the ADA is ensuring that deaf or hard-of-hearing individuals receive qualified sign language interpreter services or other auxiliary aids and services to ensure effective communication.

4. Title II of the ADA specifically applies to public entities, such as the Adams County, Colorado Sheriff's Office ("ACSO").

5. As set forth more fully below, ACSO has discriminated against deaf and hard-of-hearing individuals who have been questioned as alleged victims of crimes, against deaf or hard of hearing alleged perpetrators and against deaf or hard of hearing individuals detained at the Adams County Detention Facility ("ACDF").

6. ACSO has refused to provide effective communication for deaf persons.

7. Plaintiffs seek a court order compelling the ACSO to comply with the ADA and Section 504, monetary damages and the recovery of their reasonable attorneys' fees and costs.

## Jurisdiction and Venue

8. This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9. Venue is proper within this District pursuant to 28 U.S.C. § 1391.

## Parties

10. Colorado Cross-Disability Coalition ("CCDC") is a Colorado non-profit

corporation whose members are persons with disabilities and their non-disabled allies.

11. Colorado Association of the Deaf ("CAD") is a Colorado non-profit corporation whose members are deaf individuals and their families.

12. Plaintiff Timothy Siaki is and was at all times material hereto a resident of Colorado. Mr. Siaki is deaf.

13. Plaintiff Kimberlee Moore is and was at all times material hereto a resident of Colorado. Ms. Moore is deaf.

14. Plaintiff Michaelee Owen is and was at all times material hereto a resident of Colorado. Mr. Owen is deaf.

15. Plaintiff Jeanine Roybal is and was at all times material hereto a resident of Colorado. Ms. Roybal is Plaintiff Owen's guardian.

16. Defendant Douglas Darr is the Sheriff of Adams County, Colorado, elected and serving pursuant to Part 5, Article 10, Title 30, Colorado Revised Statutes. Sheriff Darr is responsible for the operations of ACSO. On information and belief, Sheriff Darr also serves as the custodian of the ACDF. Colo. Rev. Stat. § 30-10-511. ACSO is responsible for the operations of the ACDF. Sheriff Darr is sued in his official capacity as the Sheriff of Adams County, Colorado.

## Facts

17. Plaintiffs Siaki, Moore, Owen and Roybal are all members of CCDC and/or CAD.

18. ACSO operates an Administrative Services Division, a Patrol Division, a Sheriff's Substation, a Sheriff's Detention Division, and a Jail Division. The Jail Division

consists of a Booking Section, Court Security Section, Detective Unit, Security Section, Transport Section, Accounting Unit, Bonding Unit, Court Services Section, Mail Unit, Programs Section, Jail Records Section, and Technical Services.

19.     In May of 2010, Mr. Siaki and Ms. Moore were staying at a Super 8 Motel, located at 5888 Broadway, Denver, Colorado.

20.     Late in the evening of May 14, 2010, Ms. Moore returned home and, upon her return, she and Mr. Siaki had an argument.

21.     Both Mr. Siaki and Ms. Moore are deaf and communicate by using American Sign Language ("ASL").

22.     ASL is a separate and distinct language from English, which uses its own unique phrases, descriptions, syntax and grammatical rules.

23.     Mr. Siaki does not speak, read or write effectively in English.

24.     Mr. Siaki does not read lips.

25.     Mr. Siaki can write some words and phrases, but he does not understand most written communication.

26.     Ms. Moore has a very limited ability to speak, read and write in English.

27.     Ms. Moore can occasionally read lips when she is familiar with the speaker and the speaker's speech patterns.

28.     As set forth in records and documents from the public defender's office involved in Mr. Siaki's criminal case and from the ACSO in this case, there are conflicting statements from witnesses who claimed to hear what transpired in the room that evening; however, both Mr.

Siaki and Ms. Moore allege Mr. Siaki never harmed Ms. Moore. ACSO records demonstrate the ACSO deputies alleged Mr. Siaki harmed Ms. Moore.

29. Plaintiffs have denied and continue to deny this allegation and tried to communicate this to the ACSO's officers on May 14, 2010.

30. Like other deaf individuals, Plaintiffs Siaki and Moore both verbalize sounds which, to a person who is not deaf or who is unfamiliar, may sound like the deaf person is speaking loudly or abruptly.

31. On May 14, 2010, two ACSO deputies went to hotel room where Mr. Siaki and Ms. Moore were staying.

32. The two ACSO deputies were Jaime Keefer and Christopher Eye.

33. Deputy Keefer broke open the door to Mr. Siaki and Ms. Moore's room.

34. One of the two deputies entered the room with a gun drawn.

35. Deputy Keefer ordered Mr. Siaki to the floor.

36. Mr. Siaki did not hear him and did not understand.

37. Mr. Siaki pointed to his ears and shook his head "no" to indicate he is deaf.

38. Deputy Keefer was aware that Mr. Siaki was deaf soon after their arrival.

39. Deputy Eye was aware Ms. Moore was deaf soon after their arrival.

40. Because Mr. Siaki is deaf, he was unable to understand the Deputies' commands.

41. Deputy Keefer grabbed Mr. Siaki's left arm and physically forced him to the floor.

42. Deputy Keefer forced Mr. Siaki to the floor because he believed Mr. Siaki was

not complying with his orders.

43.     Mr. Siaki had no understanding of what the deputies said before forcing him to the floor.

44.     One of the deputies handcuffed Mr. Siaki behind his back.

45.     Deputy Keefer knew Mr. Siaki was deaf, but made assumptions that Mr. Siaki could understand Deputy Keefer.

46.     According to Deputy Keefer's statement in the record, Deputy Keefer instructed Mr. Siaki to write his version of events on a piece of paper.

47.     Deputy Keefer wrote in his Affidavit in Support of Warrantless Arrest that Mr. Siaki "refused" to write.

48.     Mr. Siaki cannot read and write effectively.

49.     Throughout their interaction on May 14, 2010, Mr. Siaki attempted as best he could to communicate to the deputies that he required a qualified sign language interpreter, but the Deputies did not offer or provide him with an interpreter.

50.     After Mr. Siaki was handcuffed, he had no way of communicating.

51.     Neither deputy attempted to offer or provide auxiliary aids and services to Mr. Siaki.

52.     Mr. Siaki's inability to communicate effectively verbally is readily apparent.

53.     Mr. Siaki's inability to communicate effectively in writing is readily apparent.

54.     The deputies had no reason to force Mr. Siaki to the floor and handcuff him except for their mistaken belief that he understood what they said and refused to comply.

55.     At or about the time Deputy Keefer forced Mr. Siaki to the floor, Deputy Eye took Ms. Moore from the room.

56.     Ms. Moore posed no threat of any kind to the health or safety of the deputies or anyone else.

57.     While outside, Deputy Eye requested that Ms. Moore complete a written statement.

58.     Ms. Moore is unable to communicate effectively by writing in English.

59.     Ms. Moore was unable to communicate effectively because she was not offered or provided a qualified sign language interpreter.

60.     Because Ms. Moore was not offered or provided with appropriate auxiliary aids and services, she was unable to communicate effectively what happened.

61.     Neither deputy attempted to offer or provide auxiliary aids and services to Ms. Moore.

62.     As a result, Ms. Moore's written statement is inaccurate.

63.     The deputies called North Washington Fire Department ("NWFD") paramedics to examine Ms. Moore.

64.     Defendant neither offered nor provided auxiliary aids and services for Ms. Moore's interactions with the paramedics.

65.     Ms. Moore was unable to effectively communicate with the paramedics because she was not provided with appropriate auxiliary aids and services.

66.     Ms. Moore wanted to communicate to the paramedics that Ms. Siaki did not hit

her.

67.     According to Deputy Keefer's Affidavit in Support of Warrantless Arrest, "Deputy Eye advised [Deputy Keefer] while Kimberly [sic] was being treated inside the ambulance she told the paramedics Timothy had hit her in the mouth."

68.     Because ACSO's deputies failed to provide effective communication, Ms. Moore was not able to communicate effectively with the deputies.

69.     Deputy Keefer decided that Mr. Siaki had hit Ms. Moore and placed him under arrest.

70.     Deputy Eye reported in a later Incident/Investigation Report as "[t]he female party changed her story and said that the male party did not punch her, that he had tried to catch her by the neck/jaw as she was falling down from tripping."

71.     Deputy Keefer completed a "Domestic Violence Case Summary" form, and directed Ms. Moore to sign it.

72.     That "Domestic Violence Case Summary" form indicated that Mr. Siaki had struck Ms. Moore with his hand, had pushed and shoved her, and that Ms. Moore did not require an interpreter.

73.     The effect of signing the "Domestic Violence Case Summary" form to comply with Deputy Keefer's instructions was that Ms. Moore affirmed that the information contained on the form was correct.

74.     Ms. Moore did not understand the form, did not complete the form, disputes several of the statements made on the form, and only signed the form because she was directed

to do so by Deputy Keefer.

75.     Mr. Siaki was handcuffed and transported to an Adams County substation for booking.

76.     Because Mr. Siaki was denied access to effective communication by the deputies, he did not know why he was being arrested and did not know where he was being taken.

77.     Because Ms. Moore was denied access to effective communication by the deputies, she did not know why Mr. Siaki was being arrested and did not know where he was being taken.

78.     While at the Adams County substation, Deputy Keefer gave Mr. Siaki a form with his Miranda rights, written in English.

79.     Deputy Keefer directed Mr. Siaki to sign the Miranda rights form.

80.     Mr. Siaki did not understand his Miranda rights.

81.     Mr. Siaki was denied access to effective communication by the deputies and, therefore, could not convey that he did not understand the Miranda form.

82.     Mr. Siaki did not understand that by signing the Miranda rights form, he was acknowledging that he understood what his rights were.

83.     Because Mr. Siaki, while in custody, was directed to sign the form by Deputy Keefer, he signed the form.

84.     At the substation, Mr. Siaki was directed to sign several other forms.  He did not understand any of the forms or the effect of his signature on those forms.

85.     Mr. Siaki signed the forms because he was afraid of the deputies who directed

him to sign the forms.

86.     The ACSO neither offered nor provided Mr. Siaki access to effective communication at the substation.

87.     Mr. Siaki remained at the substation for approximately one hour before being transported to the Adams County Detention Facility ("ACDF").

88.     For the entirety of his time at the Adams County substation, Mr. Siaki repeatedly attempted to convey he was deaf so someone would offer a sign language interpreter.

89.     The Adams County Deputies and staff did not offer or provide him with appropriate auxiliary aids and services, including a sign language interpreter.

90.     For the entirety of his time at the Adams County substation, the Adams County Deputies and staff did not offer or provide Mr. Siaki with a means by which he could communicate his need for a sign language interpreter.

91.     Due to ACSO's failure to offer or provide appropriate auxiliary aids and services, Mr. Siaki was unable to communicate effectively with anyone while at the substation.

92.     Mr. Siaki was also denied equal access to telecommunications equipment by ACSO.

93.     Other hearing detainees had access to a telephone to make a call during the booking process.

94.     Mr. Siaki was not provided access to a TDD (telecommunications device for the deaf) on equal terms as hearing inmates were provided access to telephones.

95.     After Mr. Siaki's arrest, and using the internet-based relay system, My IP Relay,

Ms. Moore called Adams County inmate information telephone number.

96.     Ms. Moore called the Adams County inmate information telephone number in order to determine what was happening to Mr. Siaki.

97.     The individual who answered Ms. Moore's telephone call, on information and belief, was an ACSO deputy or staff member by the name of Sally Elkerton.

98.     Ms. Elkerton informed Ms. Moore of Mr. Siaki's charge, and stated that she would be unable to visit him for seven more days.

99.     Ms. Moore then asked Ms. Elkerton when and where Mr. Siaki's first court appearance would be.

100.    After some delay, Ms. Elkerton told Ms. Moore that Mr. Siaki was due in court at 8:00 a.m. on the following Monday, which was approximately two days away.

101.    Ms. Elkerton told Ms. Moore that court would be convened at the ACDF address of 150 North Nineteenth Avenue, not the court address.

102.    Ms. Moore then called the ACSO at (303) 654-1850, also using a relay service and spoke with Adams County Detention Specialist Megan Moore.

103.    Ms. Moore asked Detention Specialist Moore about the date, time and location of Mr. Siaki's first court appearance. Detention Specialist Moore told Ms. Moore that the appearance would be the following Monday at 8:00 a.m.

104.    Detention Specialist Moore gave Ms. Moore a different address for Mr. Siaki's court appearance, which was for the Brighton Justice Center, 1100 Judicial Center Drive, Brighton, Colorado 80601.

105.    Detention Specialist Moore also informed Ms. Moore that a restraining order had been automatically entered, restraining Mr. Siaki from having contact with Ms. Moore.

106.    Ms. Moore was unaware of the restraining order.

107.    Ms. Moore was extremely concerned about Mr. Siaki's health and safety.

108.    Ms. Moore felt isolated because, following Mr. Siaki's arrest, she was left alone with no idea when she would be able to see and communicate with him next.

109.    Upon Mr. Siaki's arrival at the ACDF, he met with medical intake interviewers who conducted a medical intake.

110.    Mr. Siaki's disability was readily apparent to the ACSO deputies and staff at the ACDF, including the medical intake interviewers.

111.    Mr. Siaki attempted to the best of his ability to inform them he was deaf so they would provide a sign language interpreter, but neither the ACSO deputies nor ACSO staff offered or provided Mr. Siaki with appropriate auxiliary aids and services, including a sign language interpreter.

112.    ACDF staff did not provide Mr. Siaki with a means to communicate his need for an interpreter.

113.    Because ACDF staff denied him access to appropriate auxiliary aids and services, Mr. Siaki was unable to effectively communicate with the ACSO medical intake interviewers, and was unable to understand the forms the interviewers gave him.

114.    ACSO staff provided Mr. Siaki with an inmate handbook, which was written in English.

115. Mr. Siaki was unable to read or understand the inmate handbook in the absence of appropriate auxiliary aids and services.

116. Mr. Siaki was detained at the ACDF for approximately twenty-five days, from May 15, 2010 until June 10, 2010.

117. Due to the ACSO deputies' and staff's failure to provide him with appropriate auxiliary aids and services, during Mr. Siaki's entire detention at the ACDF was he unable to effectively communicate with the ACDF deputies or staff.

118. During his detention, Mr. Siaki did not understand why he was being detained.

119. During his detention, ACDF staff did not offer or provide auxiliary aids and services for any of the programs, services and activities available to hearing detainees.

120. On information and belief, the ACSO staff communicated with detainees using auditory methods which Mr. Siaki could not hear.

121. On information and belief, ACSO staff did not make such auditory communications accessible to Mr. Siaki.

122. During Ms. Moore's relay calls to the ACDF, she made clear she was deaf.

123. When Ms. Moore was finally permitted to visit Mr. Siaki, ACSO staff did not offer or provide auxiliary aids and services to facilitate their communication.

124. Ms. Moore was denied effective communication by Defendant.

125. Plaintiff Michaelee Owen was arrested on or about November 2, 2011 by the Federal Heights Police Department.

126. On information and belief, the Federal Heights Police transported Mr. Owen to

the ACDF on or about November 2, 2011.

127.    Mr. Owen was detained at the ACDF from November 2, 2011 through November 8, 2011.

128.    Mr. Owen does not speak, read or write in English effectively.

129.    Mr. Owen does not read lips.

130.    Mr. Owen communicates by using ASL.

131.    Mr. Owen's inability to communicate verbally is readily apparent.

132.    Mr. Owen's inability to communicate effectively in writing is readily apparent.

133.    ACSO Personnel were made aware that Mr. Owen is deaf when he arrived at the ACDF.

134.    ACSO never offered or provided Mr. Owen with the services of a sign language interpreter.

135.    ACSO did not offer or provide Mr. Owen an interpreter during the booking process.

136.    ACSO did not offer or provide Mr. Owen an interpreter during the intake, screening and medical evaluation process.

137.    For the entirety of his detention at the ACDF, Mr. Owen attempted to communicate that he is deaf so that ACSO Personnel would provide a sign language interpreter, but Defendant's Personnel did not offer or provide him with a sign language interpreter.

138.    On information and belief, for the entirety of his time at the ACDF, Defendant's Personnel did not offer or provide Mr. Owen with a means by which he could communicate his

need for a sign language interpreter.

139.    Due to Defendant's and Defendant's Personnel's failure to provide appropriate auxiliary aids and services, Mr. Owen was unable to communicate effectively with anyone while at the ACDF.

140.    On information and belief, Defendant and Defendant's Personnel never provided Mr. Owen with a qualified sign language interpreter or any other appropriate auxiliary aid or service, thereby denying him effective communication.

141.    Mr. Owen was also denied equal access to telecommunications equipment by Defendant and Defendant's Personnel while at the ACDF.

142.    On information and belief, during his detention at the ACDF, Defendant denied access to a TDD or other telecommunications equipment on his first day of detention.

143.    Later, ACSO Personnel brought Mr. Owen a TTY machine to make a call.

144.    The TTY machine was inoperable.

145.    ACSO Personnel never offered or provided any other access for Mr. Owen to communicate with anyone outside the ACDF.

146.    Mr. Owen was unable to communicate with anyone outside of the ACDF until his cell mate, who was not deaf but who knew some sign language, telephoned Ms. Roybal on his behalf.

147.    Defendant and Defendant's Personnel denied Mr. Owen effective communication for the entirety of his detention at the ACDF.

148.    Mr. Owen was damaged by Defendant's unlawful discrimination.

149.     Ms. Roybal is Mr. Owen's aunt and guardian.

150.     Once Ms. Roybal was informed, by Mr. Owen's cell mate, that Mr. Owen was at the ACDF, she called ACSO Personnel.

151.     ACSO Personnel informed Ms. Roybal that she would not be able to see Mr. Owen for several days.

152.     ACSO Personnel provided no means for Ms. Roybal and Mr. Owen to communicate.

153.     Other hearing inmates had access to telephones during Mr. Owen's detention.

154.     When Ms. Roybal did visit Mr. Owen, ACSO Personnel asked Ms. Roybal to interpret for Mr. Owen.

155.     Ms. Roybal was damaged by Defendant's unlawful discrimination.

156.     Defendant refuses to offer or provide sign language interpreters or other appropriate auxiliary aids and services during questioning by Defendant's deputies.

157.     Defendant refuses to offer or provide sign language interpreters or other appropriate auxiliary aids and services during booking.

158.     Defendant refuses to offer or provide sign language interpreters or other appropriate auxiliary aids and services during medical questioning.

159.     Defendant provides programs and services to detainees but does not provide auxiliary aids and services for effective communication for detainees who are deaf for such programs and services.

160.     On information and belief, Defendant has a policy, practice or custom of not

offering or providing sign language interpreters or other appropriate auxiliary aids and services during interrogations, bookings, medical questioning, counseling, programs and detentions.

161. On information and belief, Defendant has never provided a qualified sign language interpreter to any deaf individual who has been detained at the ACDF.

162. In response to a Colorado Criminal Justice Records Act request by the Colorado Cross-Disability Coalition, Defendant reported that nine detainees identified as deaf were booked at the ACDF from December 2009 to August 2011.

163. Defendant denies access to auxiliary aids and services for deaf detainees (e.g., a TTY or video phone) to communicate with persons outside the ACDF during times when hearing detainees are permitted to make telephone calls.

164. Defendant has no policies informing Defendant's Personnel about providing appropriate auxiliary aids and services to detainees who are deaf or hard of hearing.

165. Defendant does not make deaf individuals aware that auxiliary aids and services, including sign language interpreters, are available.

166. Plaintiffs and other deaf individuals will be harmed if Defendant does not change its policies, practices and procedures.

167. Plaintiffs and other deaf individuals will be harmed if Defendant does not immediately adopt and implement policies, practices and procedures to ensure that deaf detainees are provided with effective communication.

168. CCDC's purpose is to promote independence, self-reliance, and full participation for people with all types of disabilities, and to combat discrimination against individuals with

disabilities, through advocacy, education, research and training.  As a part of that purpose, CCDC seeks to ensure that individuals who are deaf and hard-of-hearing have access to -- and do not encounter discrimination in -- participating in government services, including services while encountering law enforcement officials, and while being arrested, booked, interrogated, and detained.

169.     CCDC engages in extensive outreach as well as advocacy and educational efforts to promote access for and combat discrimination against people with disabilities.  This effort and this purpose have been and continue to be adversely affected by Defendant's violations of the ADA and Section 504.

170.     Defendant and Defendant's Personnel's actions have caused and continue to cause distinct, palpable and perceptible injury to CCDC.  Those injuries include, but are not limited to, those described herein.

171.     CCDC has devoted resources, which could have been devoted to its other outreach, advocacy, and educational efforts, to communicating with Defendant in an attempt to secure accessible services, activities and programs.

172.     CCDC has devoted resources, which could have been devoted to its other outreach, advocacy, and educational efforts, to educate members and others who have been injured by Defendant's discrimination.

173.     Defendant's and discrimination has been and continues to be a barrier to the full participation of persons with disabilities and, therefore, frustrates CCDC's ability to achieve full inclusion for persons with disabilities.  For example:

a. Defendant's discrimination, in and of itself, denies effective communication to people who are deaf; and,

b. Defendant's actions send the message that such discrimination continues to be acceptable at this time.

174. Defendant's discrimination has required and continues to require CCDC to make a greater effort -- and to allocate significant resources -- to educate the public that such discrimination is wrong and otherwise to counteract the adverse impact of such discrimination. This perceptibly impairs CCDC's counseling, advocacy, educational, and training missions.

175. CCDC also has devoted and continues to devote resources -- including but not limited to those devoted to the present lawsuit -- to identifying and counteracting the sources of discrimination in the community, including that of Defendant.

176. CCDC's injuries -- including, without limitation, those described herein -- are traceable to Defendant's discriminatory conduct alleged in this Complaint and will be redressed by the relief requested in it.

177. CCDC's members include individuals who are deaf and hard of hearing who require auxiliary aids and services for effective communication.

178. CCDC's members have been injured and will continue to be injured by Defendant's discrimination described above.

179. The elimination of discrimination, such as that of Defendant, is at the core of CCDC's organizational purpose.

180. The participation of individual CCDC members in the lawsuit is not required

either to resolve the claims at issue or to formulate relief.

181.    CAD's purpose is to protect the rights of the deaf individuals and their families, to empower deaf individuals to exercise self-determination and independence, and to advocate for equal opportunities in social, educational, and employment opportunities in Colorado.  As a part of that purpose, CAD seeks to ensure that deaf individuals and individuals who are hard-of-hearing have access to -- and do not encounter discrimination in -- participating in government services, including services while encountering law enforcement officials, and while being arrested, booked, interrogated, and detained.

182.    CAD engages in extensive outreach as well as advocacy and educational efforts to promote access for and combat discrimination against deaf individuals.  This effort and this purpose have been and continue to be adversely affected by Defendant's violations of the ADA and Section 504.

183.    Defendant's and Defendant's Personnel's actions have caused and continue to cause distinct, palpable and perceptible injury to CAD.  Those injuries include, but are not limited to, those described herein.

184.    CAD has devoted resources, which could have been devoted to its other outreach, advocacy, and educational efforts, to educate members and others who have been injured by Defendant's discrimination.

185.    Defendant's discrimination has been and continues to be a barrier to the full participation of deaf individuals and, therefore, frustrates CAD's ability to achieve full inclusion for deaf individuals.  For example:

a. Defendant's discrimination, in and of itself, denies effective communication to deaf individuals; and

b. Defendant's actions send the message that such discrimination continues to be acceptable at this time.

186. Defendant's discrimination has required and continues to require CAD to make a greater effort -- and to allocate significant resources -- to educate the public that such discrimination is wrong and otherwise to counteract the adverse impact of such discrimination. This perceptibly impairs CAD's counseling, advocacy, educational, and training missions.

187. CAD also has devoted and continues to devote resources -- including but not limited to those devoted to the present lawsuit -- to identifying and counteracting the sources of discrimination in the community, including that of Defendant.

188. CAD's injuries -- including, without limitation, those described herein -- are traceable to Defendant's discriminatory conduct alleged in this Amended Complaint and will be redressed by the relief requested in it.

189. CAD's members include deaf individuals who require auxiliary aids and services for effective communication.

190. CAD's members have been injured and will continue to be injured by Defendant's discrimination described above.

191. The elimination of discrimination, such as that of Defendant, is at the core of CAD's organizational purpose.

192. The participation of individual CAD members in the lawsuit is not required either

to resolve the claims at issue or to formulate relief.

### First Claim for Relief
(Violations of the ADA)

193. Plaintiffs reallege and incorporate by reference the remainder of the allegations set forth in this Complaint as fully set forth herein.

194. Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."

195. Public entities are defined as "any State or local government; [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(A)-(B).

196. Defendant is a public entity within the meaning of the ADA.

197. Plaintiff Siaki is a qualified individual with a disability. *See* 42 U.S.C. § 12131(2).

198. Plaintiff Moore is a qualified individual with a disability. *See* 42 U.S.C. § 12131(2).

199. Plaintiff Owen is a qualified individual with a disability. *See* 42 U.S.C. § 12131(2).

200. Plaintiff Roybal is an individual known to have a relationship or association with an individual, Plaintiff Owen, known to have a disability. *See* 28 C.F.R. § 35.130(g).

201. CCDC has members who are also qualified individuals with disabilities.

202.     CAD has members who are also qualified individuals with disabilities.

203.     Defendant has discriminated against Plaintiff Siaki on the basis of his disability.

204.     Defendant has discriminated against Plaintiff Moore on the basis of her disability.

205.     Defendant has discriminated against Plaintiff Owen on the basis of his disability.

206.     Defendant has excluded or otherwise denied equal services, programs, or activities to Plaintiff Roybal on the basis of her known association with Plaintiff Owen, who is an individual with a disability.

207.     Plaintiffs have been, and will continue to be, injured, damaged and aggrieved by Defendant's discrimination and exclusion and/or denial of equal services, programs, or activities.

208.     Plaintiffs Siaki, Moore, Owen and Roybal, other CCDC members who are deaf, and other CAD members are likely to encounter the same discriminatory policies and practices.

209.     In the absence of the injunction requested herein, Defendant will continue to discriminate against and/or exclude and/or deny equal services, programs, or activities to Plaintiffs Siaki, Moore, Owen, Roybal, CCDC and CAD, including their members, on the basis of disability in violation of Title II of the ADA and its implementing regulations.

210.     Defendant's Personnel acted intentionally and with a reckless disregard for Plaintiff Siaki's civil rights.

211.     Defendant's Personnel acted intentionally and with a reckless disregard for Plaintiff Moore's civil rights.

212.     Defendant's Personnel acted intentionally and with a reckless disregard for Plaintiff Owen's civil rights.

213.	Defendant's Personnel acted intentionally and with a reckless disregard for Plaintiff Roybal's civil rights.

214.	Defendant's Personnel acted intentionally and with a reckless disregard for the civil rights of individuals who are deaf or hard of hearing.

215.	Defendant's Personnel acted intentionally and with a reckless disregard for Plaintiffs' civil rights.

216.	Plaintiffs have been injured, damaged and aggrieved by and will continue to be injured, damaged and aggrieved by Defendant's discrimination and/or exclusion and/or denial of equal services, programs, or activities.

## Second Claim for Relief
### (Violations of Section 504)

217.     Plaintiffs reallege and incorporate by reference the remainder of the allegations set forth in this Complaint as fully set forth herein.

218.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

219.     Defendant receives federal financial assistance through state and federal programs.

220.     In addition, Defendant's law enforcement and detention activities constitute the operation of "a department, agency, special purpose district, or other instrumentality of a State or of a local government[.]" 29 U.S.C. § 794(b)(1)(A).

221.     Plaintiff Siaki is a qualified individual with a disability and has been subjected to discrimination by ACSO, as described in this Complaint, solely on the basis of his disability. Such discrimination includes the failure to provide auxiliary aids and services in order to ensure effective communication.

222.     Plaintiff Moore is a qualified individual with a disability and has been subjected to discrimination by the ACSO, as described in this Complaint, solely on the basis of her disability. Such discrimination includes the failure to provide auxiliary aids and services in order to ensure effective communication.

223.     Plaintiff Owen is a qualified individual with a disability and has been subjected to discrimination by the ACSO, as described in this Complaint, solely on the basis of his disability. Such discrimination includes the failure to provide auxiliary aids and services in order to ensure effective communication.

224.     Plaintiff Roybal is an individual with a relationship or association with an individual with a known disability and has been subjected to exclusion and/or denial of equal services, programs, or activities discrimination by the ACSO, as described in this Complaint, solely on the basis of Mr. Owen's disability. Such exclusion and/or denial includes without limitation the failure to provide auxiliary aids and services in order to ensure effective communication.

225.     CCDC members are individuals with disabilities, and are qualified to participate in the services, programs, activities and benefits of Defendant's law enforcement activities within the meaning of Section 504.

226.     CAD members are deaf individuals, and are qualified to participate in the services, programs, activities and benefits of Defendant's law enforcement activities within the meaning of Section 504.

227.     Defendant and its agents acted intentionally and with a reckless disregard for Plaintiffs' civil rights.

228.     Defendant and its agents acted intentionally and with a reckless disregard for the civil rights of individuals who are deaf or hard of hearing.

229.     Plaintiffs have been injured, damaged and aggrieved by and will continue to be

injured, damaged and aggrieved by Defendant's discrimination and unlawful actions.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray:

That this Court assume jurisdiction;

That this Court issue an Order declaring Defendant to be in violation of Section 504 and Title II of the ADA;

That this Court issue an injunction ordering Defendant to provide qualified sign language interpreters or other appropriate auxiliary aids or services in order to ensure effective communication with deaf and hard-of-hearing individuals;

That this Court award Plaintiffs' damages;

That this Court award Plaintiffs their reasonable attorneys' fees and costs; and

That this Court award such additional or alternative relief as may be just, proper and equitable.

JURY DEMAND:  Plaintiffs request this case be heard by a jury.

Dated: January 25, 2012                    Respectfully Submitted,

                                            _/s/ Kevin W. Williams_____
                                            Kevin W. Williams
                                            Andrew C. Montoya
                                            Colorado Cross-Disability Coalition
                                            655 Broadway, Suite 775
                                            Denver, Colorado 80203
                                            Phone: (303) 839-1775
                                            Facsimile: (303) 839-1782
                                            E-mail: kwilliams@ccdconline.org
                                            E-mail: amontoya@ccdconline.org

                                            Attorneys for Plaintiffs

Address of Plaintiff Timothy Siaki:

9801 East 1st Avenue
Apartment A-205
Aurora, CO 80010

Address of Plaintiff Kimberlee Moore:

9801 East 1st Avenue
Apartment A-205
Aurora, CO 80010

Address of Plaintiff Michaelee Owen:
9740 Detroit Street
Thornton, CO 80229

Address of Plaintiff Jeanine Roybal:
9740 Detroit Street
Thornton, CO 80229

Address for Plaintiff Colorado Cross-Disability Coalition:

655 Broadway, Suite 775
Denver, Colorado 80203

Address for Plaintiff Colorado Association of the Deaf

P.O. Box 370294
Denver, CO 80237